# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MICHAEL LEE RODRIGUEZ, ) | |
| ) | |
| Plaintiff ) | |
| ) | Civil Action No. 10-1349 |
| v. ) | |
| ) | **ELECTRONICALLY FILED** |
| COMMISSIONER OF ) | |
| SOCIAL SECURITY, ) | |
| ) | |
| Defendant ) | |

## **MEMORANDUM OPINION**

**I.    INTRODUCTION**

Michael Lee Rodriguez ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401 – 433 ("Act").  This matter comes before the Court on cross motions for summary judgment. (ECF Nos. 6, 7).  The record has been developed at the administrative level.  For the following reasons, Plaintiff's Motion for Summary Judgment will be DENIED, and Defendant's Motion for Summary Judgment will be GRANTED.

## II. PROCEDURAL HISTORY

Plaintiff filed for DIB with the Social Security Administration on April 27, 2009, claiming an inability to work due to disability beginning April 25, 2004. (R. at 136)[1]. Plaintiff was initially denied benefits on July 17, 2009. (R. at 77 – 81). A hearing was scheduled for January 4, 2010, and Plaintiff appeared to testify represented by counsel. (R. at 6). A vocational expert and Plaintiff's fiancé also testified. (R. at 6 – 40). The Administrative Law Judge ("ALJ") issued his decision denying benefits to Plaintiff on January 20, 2010. (R. at 65 – 76). Plaintiff filed a request for review of the ALJ's decision by the Appeals Council, which request was denied on September 1, 2010, thereby making the decision of the ALJ the final decision of the Commissioner. (R. at 1 – 4).

Plaintiff filed his Complaint in this Court on October 14, 2010. Defendant filed his Answer on January 3, 2011. Cross motions for summary judgment followed.

## III. STATEMENT OF THE CASE

### A. General Background

Plaintiff was born January 13, 1971, and was thirty eight years of age on the date of his administrative hearing.[2] (R. at 136). He resided in a second floor apartment with his fourteen year old son. (R. at 11). Plaintiff was engaged to be married, and had two other children by another woman. (R. at 32, 298). Plaintiff had no post-secondary education, having only completed the eleventh grade. (R. at 13). Also, for much of Plaintiff's time in school, he was placed in special education classes for a learning disability. (R. at 13). Plaintiff was still capable of maintaining gainful, full-time employment as a heavy equipment operator/ laborer for an

---

[1] Citations to ECF Nos. 4 – 4-7, the Record, *hereinafter*, "R. at __."

[2] Plaintiff is defined as a "Younger Person." 20 C.F.R. §§ 404.1563, 416.963.

excavating company, and previously as an auto body mechanic. (R. at 14). He also served as a firefighter. (R. at 23).

Plaintiff sustained injury to his lower back on April 25, 2004, while working on-scene as a fireman. (R. at 229, 233, 297). Plaintiff was pulling a tree away from a fire area, when his right foot struck a curb and he fell backwards onto a large branch. (R. at 285, 294). Plaintiff did not seek treatment and worked through the rest of the day. (R. at 15, 294, 297). The following day Plaintiff's pain was "severe." (R. at 297). Since that time he has complained of constant back pain and intermittent numbness in the left foot. (R. at 294). Plaintiff received a worker's compensation settlement due to his accident. (R. at 12). He has neither engaged in nor sought out employment opportunities since his injury. (R. at 14).

B. Treatment History

Magnetic resonance imaging ("MRI") of Plaintiff's spine was conducted on May 5, 2004. (R. at 240). The thoracic, lumbar, and sacral spine were imaged. (R. at 240). Scanning uncovered only a central disc herniation slightly compressing the thecal sac at the L4 – L5 level of the lumbar spine. (R. at 240). Results were otherwise unremarkable.

At the recommendation of his doctor, Plaintiff engaged in physical therapy beginning in May of 2004, and ending in October of 2004. (R. at 210 – 20, 222 – 29). From the outset, Plaintiff was noted as exhibiting a negative attitude about participating in physical therapy. (R. at 220). At his initial consultation on May 11, 2004, Plaintiff complained of substantial, radiating lower back pain, which was disturbing his sleep patterns and was not responding to chiropractic intervention. (R. at 229). Plaintiff stated that he could not maintain any position for more than five minutes due to his pain. (R. at 229). At the time, he was not taking any pain medication. (R. at 229).

After approximately five therapy sessions, Plaintiff's spinal mobility had not exhibited much improvement, though there was improved tolerance for increased activity. (R. at 228). There was an antalgic pattern to Plaintiff's gait, though this was not apparent when Plaintiff was asked to do lunges. (R. at 220, 228). There was also an absence of deep tendon reflexes. (R. at 220). By June 17, however, Plaintiff experienced a reduction in pain and his functional mobilization and range of exercises had increased. (R. at 218 - 19, 227). Some reflexes in Plaintiff's lower extremities were also detectable. (R. at 219). Plaintiff tolerated exercises without difficulty, and was able to heel and toe walk. (R. at 218). Neurotension signs were also reduced. (R. at 219). However, positive straight leg raising was noted. (R. at 219).

As therapy progressed, Plaintiff continued to have gait deviations, but his straight leg raising improved. (R. at 217). Plaintiff's lower extremity strength was improving, as well. (R. at 225). Plaintiff's overall pain intensity was lessened, he felt more mobile, and had an increased tolerance for stretching. (R. at 215 – 16). Plaintiff generally tolerated his therapy without problems. (R. at 215 – 16). However, his range of motion in the lower back was not making significant improvements, and Plaintiff also reported deep lower back pain accompanied by paraspinal spasm. (R. at 215, 225).

By August of 2004, Plaintiff exhibited negative straight leg raising, and claimed an overall higher tolerance for activity. (R. at 212, 224). Plaintiff was able to walk on his heels and toes. (R. at 224). Yet, deep tendon reflexes were still difficult to elicit. (R. at 214). Plaintiff continued to tolerate his therapy regimen without problems. (R. at 212 – 14). Plaintiff had also been released for light duty work, although he could not yet return to his former employment because no light duty work was available. (R. at 212).

During his therapy sessions in September of 2004, Plaintiff continued to see some improvement in symptoms and continued to tolerate his therapy without problems. (R. at 211). Yet, significant improvements were not observed. (R. at 210). It was noted that Plaintiff's strength deficits were related to his pain and were not in a neurologic distribution. (R. at 223). Plaintiff was recommended for discharge from physical therapy because of a lack of further progress. (R. at 223). Plaintiff was advised to engage in a weight-lifting program at a local health club to maintain his strength and level of activity. (R. at 223). At the date of discharge, on October 5, 2004, it was noted that Plaintiff tolerated his therapy and exercise regimens well. (R. at 222). It was again noted that Plaintiff was not limited in a neurological pattern, but rather by his reported low back pain and associated resistance in the lower extremities. (R. at 222).

On October 13, 2004, Plaintiff visited Jorge L. Acevedo, M.D. regarding his back pain. (R. at 233). Upon examination, Dr. Acevedo noted markedly reduced flexion of the back, positive straight leg raising, and an absence of deep tendon reflexes in the lower extremities. (R. at 233). Dr. Acevedo made note of Plaintiff's May 2004 MRI results indicating degenerative changes and protrusion of the disc at the L4 – L5 level of Plaintiff's spine. (R. at 233). Dr. Acevedo recommended a lumbar myelogram and computed tomography ("CT") scan of Plaintiff's lumbar spine. (R. at 233).

On October 25, 2004, Plaintiff underwent a lumbar myelogram and CT scan of the lumbar spine. (R. at 234 – 35). The myelogram was unremarkable – the lumbar spine showed anatomic alignment, and the thecal sac and nerve root sheaths appeared normal and symmetrical. (R. at 234). The CT scan showed anatomic alignment of the lumbar spine, and was unremarkable except for minimal disc bulges at the L4 – S1 levels of the spine. (R. at 235). No central canal stenosis or narrowing of neural foramen was seen. (R. at 235).

Plaintiff was seen by Zheng Wang, M.D. on March 24, 2005. (R. at 276). Dr. Wang noted Plaintiff's chronic lower back pain and his left leg numbness. (R. at 276). After reviewing an October 2004 CT scan, Dr. Wang found no evidence of nerve root impingement. (R. at 276). He also found that nerve blocks administered at the pain management clinic had provided Plaintiff with relief. (R. at 276). Pain medications had reduced Plaintiff's pain to a three or four on a pain scale of ten. (R. at 276). Plaintiff's gait was normal, he did not have reduced lumbar lordosis, had only mild thoracolumbar paraspinal muscle spasm with no tenderness, demonstrated negative straight leg raising, and exhibited some tenderness on the L4 – S1 spinous process. (R. at 277). Plaintiff was able to perform a heel and toe walk. (R. at 277). He was diagnosed with lumbago, L4 – L5 disc herniation or protrusion, and chronic lumbrosacral pain syndrome. (R. at 277). Plaintiff was instructed to continue with current pain medications for treatment. (R. at 278).

Plaintiff underwent an electromyelogram/ nerve conduction study on March 31, 2005. (R. at 274). There was evidence of chronic bilateral L5 radiculopathy. (R. at 274). There was no evidence of peripheral polyneuropathy. (R. at 274). An MRI of Plaintiff's lumbar spine on November 6, 2006 showed intradiscal degenerative change at the L4 – L5 level of the spine, with paramedian disc herniation producing mild neural canal encroachment. (R. at 239). The MRI was otherwise unremarkable. A June 12, 2008 MRI of Plaintiff's lumbar spine evidenced persistent paramedian disc herniation producing canal stenosis at the L4 – L5 level of the spine, and effacing the thecal sac. (R. at 238).

On June 20, 2008, Plaintiff visited neurosurgeon Daniel A. Wecht, M.D. at the behest of his chiropractor, Donald Cenk. (R. at 292). Dr. Wecht studied Plaintiff's June 12, 2008 MRI, noting evidence of a small paracentral disc protrusion and the L4 – L5 level of Plaintiff's spine.

(R. at 292). However, there was no evidence of nerve root irritation, and despite the interpretation provided with the 2008 MRI, Dr. Wecht found that there was also no evidence of significant foraminal or central canal stenosis. (R. at 292). Given that Plaintiff's past conservative treatment via injections, physical therapy, and chiropractic care had not provided Plaintiff with complete relief, Dr. Wecht felt that surgery would not necessarily provide a sure remedy for Plaintiff's persistent pain. (R. at 292). Dr. Wecht referred Plaintiff to a complex spine specialist for further consultation. (R. at 292).

Following his appointment with Dr. Wecht, Plaintiff visited neurosurgeon Peter C. Gerszten, M.D. for a surgical evaluation on July 11, 2008. (R. at 294 – 95). Plaintiff complained of constant lower back pain and intermittent numbness of the left foot. (R. at 294). Despite extensive physical therapy and pain management – including various injections, Plaintiff claimed not to have experienced significant improvement. (R. at 294). Upon examination, Dr. Gerszten found Plaintiff in no acute distress, Plaintiff's gait had a mild right foot steppage, extension and rotation were within normal limits, and Plaintiff was capable of doing a heel and toe walk. (R. at 294). Plaintiff refused to perform lumbar flexion or to do straight leg raises. (R. at 294). There was tenderness at the L4 – S1 level of Plaintiff's spine. (R. at 294). Sensation was intact, a motor examination was 5/5, and deep tendon reflexes were 2+. (R. at 294). Review of Plaintiff's June 12, 2008 MRI and March 31, 2005 electromyelogram illustrated L4 – L5 disc herniation and chronic bilateral radiculopathy. (R. at 295). Dr. Gerszten discussed possible spinal surgery with Plaintiff, although Plaintiff was unwilling to consider surgery at the time. (R. at 295).

On August 13, 2008, Plaintiff visited neurosurgeon Matt El-Kadi, M.D. for a second opinion regarding potential surgical intervention. (R. at 297 – 98). Plaintiff complained of constant low back pain. (R. at 297). Pain worsened with walking and general activity. (R. at

297). Plaintiff stated that physical therapy had provided no relief and injections for pain were also ineffective. (R. at 297). Upon examination, Dr. El-Kadi found Plaintiff to be in no acute distress, suffering some limited range of motion in the paraspinal muscles, but without weakness. (R. at 298). After reviewing Plaintiff's June 12, 2008 MRI, Dr. El-Kadi noted evidence of central disk protrusion at the L4 – L5 level of Plaintiff's spine, and degenerative disk disease. (R. at 298). Dr. El-Kadi informed Plaintiff that surgical intervention would likely provide little relief for his complaints of pain, particularly in light of the failure of earlier attempts at conservative treatment. (R. at 298).

Plaintiff visited Dr. Wang again on March 17, 2009. (R. at 271). Plaintiff continued to complain of constant severe pain in his lower back. (R. at 271). Dr. Wang noted that injections administered at a pain management clinic were consistently ineffective in treating Plaintiff's claimed pain. (R. at 271). Plaintiff alleged that he was limited in terms of physical activity. (R. at 271). However, Dr. Wang noted that Plaintiff had responded well to the prescription pain medication Tylenol No. 3 which he had received at the pain management clinic. (R. at 271). At the time, Plaintiff's straight leg raising tests were negative and he had normal sensation and motor strength in both lower extremities. (R. at 272). There was significant tenderness and spasm in the thoracic and lumbar paraspinal muscles. (R. at 272).

In June of 2009, Plaintiff was continuing to take Tylenol No. 3. (R. at 270). Dr. Wang noted that the medication, in addition to prescribed Flector patches, allowed Plaintiff to be more active. (R. at 270). Plaintiff could sit for forty five minutes, could stand for thirty minutes, and could walk for forty five minutes. (R. at 270). Plaintiff's gait was normal and his conservative pain management was allowing him to make fair progress. (R. at 270).

In July of 2009, one of Plaintiff's chiropractors, Jason E. Domer, summarized his treatment history with Plaintiff – spanning April of 2004 through February of 2007. (R. at 257 – 60). Over the course of his treatment, Plaintiff's pain decreased and his range of motion in the lumbar spine increased. (R. at 257 – 60). Plaintiff had fairly consistent positive straight leg raising, however. (R. at 257 – 60).

C. <u>Functional Capacity</u>

On April 12, 2007, Plaintiff was examined for the purpose of an independent medical evaluation by Gerard J. Werries, M.D. (R. at 284 – 88). Dr. Werries reviewed all of Plaintiff's medical records. (R. at 284 – 85). It was noted that following Plaintiff's accident, he developed severe pain across his lower back and radiating pain and numbness in his left leg. (R. at 285). Plaintiff was initially treated by Robert Liss, M.D. and had been released for sedentary work in June of 2004. (R. at 285). Plaintiff was approved for light duty work by Dr. Liss in August of 2004. (R. at 285). Dr. Liss eventually referred Plaintiff to Dr. Acevedo for further treatment. (R. at 285). Following a CT scan and myelogram, Dr. Acevedo informed Plaintiff that if he underwent back surgery, there was only a twenty to thirty percent chance he would experience improvement in his back condition. (R. at 285). Dr. Acevedo recommended Plaintiff attend a pain management clinic and receive injections for treatment. (R. at 285). Plaintiff would eventually receive a combination of facet joint injections and epidural steroid injections, but to little benefit. (R. at 285 – 86). At an earlier independent medical evaluation in April of 2005, Plaintiff was found to be capable of maintaining a sedentary job position. (R. at 286).

Dr. Werries noted that Plaintiff complained of back pain ranging from four to five on a pain scale of ten. (R. at 286). Plaintiff complained of persistent pain and intermittent numbness of the left leg. (R. at 286). Plaintiff's pain was exacerbated by prolonged walking, bending, and

9

lifting. (R. at 286). Plaintiff often needed to change positions and lay with a pillow between his legs to obtain pain relief. (R. at 286). Upon examination, Plaintiff was capable of heel and toe walking, his gait was normal, and he had negative straight leg raising tests. (R. at 286). He had moderate pain in the mid lower lumbar region, and mild pain on the left lower lumbar paraspinal region. (R. at 286). Achilles tendon reflexes were symmetric and physiologic, but patellar tendon reflexes were absent. (R. at 286). MRI, CT, and electromyelogram results indicated Plaintiff suffered a mild disc herniation at the L4 – L5 level of the spine, mild left foraminal stenosis at the L4 – L5 level, some degenerative disc disease at L4 – S1, and chronic bilateral L5 radiculopathy. (R. at 286 – 87).

Dr. Werries determined that, in light of the above facts, Plaintiff was capable of returning to work with the following limitations: Plaintiff could sit no more than four hours in an eight hour workday; Plaintiff could stand and/ or walk no more than four hours; Plaintiff could lift and/ or carry less than twelve pounds frequently; Plaintiff could lift/ carry up to twenty-five pounds occasionally; and Plaintiff could not climb ladders. (R. at 287 – 88).\

On January 23, 2008, Dr. Wang filled out a form for the Penn Hills Volunteer Fireman's Relief Association indicating Plaintiff's functional limitations. (R. at 299). On the form, Dr. Wang indicated that Plaintiff suffered from lumbar spondylosis and right sacroiliac joint dysfunction. (R. at 299). Plaintiff suffered decreased range of motion in the lumbar spine, with tenderness and spasm. (R. at 299). He also walked with a slightly antalgic gait, and had positive straight leg raising tests. (R. at 273). Plaintiff's chronic pain was exacerbated by work activity. (R. at 299). Plaintiff was not capable of bending, kneeling, lifting or carrying anything over fifteen pounds, frequent stair climbing, standing or walking for more than thirty minutes, or sitting for more than thirty minutes. (R. at 299).

One of Plaintiff's chiropractors, Donald Cenk, performed a functional capacity assessment and examination for Plaintiff on June 10, 2009. (R. at 251 – 54). In it, he noted that Plaintiff suffered chronic low back pain and intermittent lower extremity numbness and pain. (R. at 253). Plaintiff was observed to have an antalgic gait, moderate lumbrosacral paraspinal spasm with point tenderness and the L3 – S1 paraspinals. (R. at 253). It was noted that Plaintiff was hesitant to utilize his prescription pain medications because of side-effects. (R. at 254). Despite his pain and the side effects, Plaintiff has been able to maintain a high level of functionality. (R. at 254). Plaintiff was diagnosed with chronic lumbrosacral sprain/ strain syndrome, chronic bilateral L5 radiculopathy, questionable L4 – S1 intervertebral discs, and questionable right lumbar myofascitis with possible dural adhesions. (R. at 253).

Plaintiff was averred to be capable of frequently lifting and carrying two to three pounds, standing and walking one to two hours of an eight hour workday, sitting two to four hours, limited upper and lower extremity pushing and pulling, and occasional bending and kneeling. (R. at 251 – 52). Plaintiff was determined not to be capable of stooping, crouching, balancing, or climbing. (R. at 252).

On July 15, 2009, state agency consultant Marsha Freshwater reviewed Plaintiff's medical record and conducted a physical residual functional capacity ("RFC") assessment for purposes of Plaintiff's claim for DIB. (R. at 261 – 67). Plaintiff was found capable of frequently lifting up to ten pounds, occasionally lifting up to twenty pounds, standing or walking approximately six hours of an eight hour workday, sitting approximately six hours, and only occasionally climbing, balancing, stooping, kneeling, crouching, or crawling. (R. at 262 – 63). In all other respects, Plaintiff was not limited. (R. at 262 – 64). Ms. Freshwater found that Plaintiff suffered medically determinable impairments in the way of bulging lumbar discs and a

herniated L4 – L5 disc. (R. at 266). She noted the results of Plaintiff's 2008 MRI and 2004 CT scan. (R. at 266).

Of importance in Ms. Freshwater's determination was Plaintiff's ability to care for his personal needs and his household, drive independently, ambulate without an assistive device, and control pain with prescribed medications. (R. at 266). He was also observed standing, walking, and sitting without noticeable difficulty while at the social security field office. (R. at 266). Ms. Freshwater believed that Plaintiff's chiropractor, Donald Cenk, overestimated Plaintiff's functional limitations because she felt the limitations conflicted with the weight of the evidence on record. (R. at 267).

### D. Administrative Hearing

Problems Plaintiff perceived as limiting his capacity to work included the inability to sit, stand, or walk for prolonged periods due to debilitating radiating pain originating in his back, and sudden, unexpected weakness in his legs that sometimes caused Plaintiff to fall. (R. at 16). Numbness was also an issue. (R. at 19). Plaintiff testified that going to the chiropractor and grocery store in the same day could render him unable to function the rest of the day due to pain and weakness. (R. at 16). The stairs to Plaintiff's apartment also exhausted him quickly. (R. at 17, 25). He claimed that on a normal day, his pain was a five or six on a pain scale of ten. (R. at 16). The pain was chronic and easily exacerbated by activity. (R. at 16 – 17). On the whole, his pain had progressively worsened since his initial injury. (R. at 19). On a bad day, Plaintiff's pain would be eight or nine on a pain scale of ten. (R. at 26). Laying down, holding himself up with his arms while seated, and frequently changing positions often helped alleviate some of Plaintiff's pain. (R. at 17, 25, 30). Prescription Tylenol and Flector patches also provided some pain relief, although Plaintiff complained of drowsiness when on his medications. (R. at 19).

Epidural steroid injections and nerve blocks had provided little pain relief. (R. at 27 – 28). Surgery could potentially moderate some of Plaintiff's pain, but there was no guarantee. (R. at 28).

Plaintiff explained that he did not require the use of an assistive device to walk. (R. at 14). Nor had any assistive device had been prescribed by any of his doctors. (R. at 14). However, Plaintiff does wear a brace on his back. (R. at 14). While Plaintiff asserted that none of his physicians had cleared him to return to work, he also admitted that none had recommended that he not work. (R. at 17). Dr. Wang had informed Plaintiff that he should avoid walking, sitting, and standing for extended periods, and that he should limit his use of stairs. (R. at 18). Plaintiff testified that his chiropractor advised that he not work. (R. at 18).

A typical day for Plaintiff began at six or seven o'clock in the morning. (R. at 20). Plaintiff would make himself breakfast, watch the news, and attend chiropractic sessions when scheduled. (R. at 20). During the remainder of the day, Plaintiff would stay at home and watch television. (R. at 20). Plaintiff had no hobbies and did not exercise. (R. at 22). Friends would often visit Plaintiff at his apartment, and sometimes Plaintiff would go out with friends or visit them at their homes. (R. at 23). Occasionally he would wash dishes or engage in light cleaning around the apartment. (R. at 20, 22). Sometimes he would make himself a simple lunch. (R. at 20). He would also make dinner for him and his son, though the meals tended to be simple and convenient. (R. at 21, 28 – 29). Plaintiff's fiancé would also cook for him and his son. (R. at 21). Plaintiff would usually go to bed around ten or eleven o'clock at night. (R. at 21). Plaintiff claimed that he would often have difficulty sleeping soundly, however, because his back pain made it difficult to find, and stay in, comfortable positions. (R. at 21).

Plaintiff is capable of dressing himself and caring for his personal hygiene independently. (R. at 21). Plaintiff and his son split laundry and cleaning duties. (R. at 12, 22). When going shopping for groceries or clothing, Plaintiff is typically accompanied by his fiancé. (R. at 22, 29 – 30). Plaintiff still drives and was responsible for bringing himself to the hearing. (R. at 12). To access his second story apartment, Plaintiff was required to ascend one flight of stairs. (R. at 12, 25). Plaintiff stated that he was capable of carrying two bags of groceries at a time. (R. at 23). He was also able to walk approximately two and a half blocks at a time, though his left leg and foot would frequently go numb. (R. at 24). Plaintiff was able to sit for about an hour before his back pain would increase. (R. at 26). However, as with his ability to stand, this varies from day to day. (R. at 26).

Plaintiff's fiancé, Ms. Valjean, testified following Plaintiff. (R. at 31). She had known Plaintiff since 2000. (R. at 32). While at home, Plaintiff was constantly shifting positions to relief his discomfort. (R. at 33 – 34). There were days when Plaintiff was obviously in more pain than usual and Ms. Valjean has witnessed Plaintiff's legs buckle – resulting in a fall. (R. at 34). She testified that Plaintiff's pain medication made him drowsy and less functional. (R. at 35). When they went shopping together, they took two carts to assist Plaintiff with walking. (R. at 32). Ms. Valjean believed that he needed a cane although Plaintiff resisted the idea. (R. at 32).

After Ms. Valjean's testimony, the ALJ asked the vocational expert what employment opportunities would be available to a hypothetical person of Plaintiff's age, education level, and work background, and limited to sedentary work that would allow for no more than four hours sitting and four hours standing and walking in an eight hour workday, would not require climbing ladders, ropes, or scaffolds, would require only occasional postural movements, and would allow for alternating between sitting and standing every thirty to forty five minutes. (R. at

14

36 – 37). The vocational expert explained that the following jobs would be available to such a person: "assembler of small parts," with over 225,000 positions available in the national economy; "ticket check," with over 200,000 positions; and, "order clerk," with over 150,000 positions. (R. at 37).

The ALJ then inquired whether any jobs would be available if the hypothetical person needed to lie prostrate for one to two hours per day because of pain. (R. at 38). The vocational expert testified that no jobs would be available with such an accommodation. (R. at 38). Plaintiff's attorney then asked whether the, "assembler of small parts," and, "order clerk," positions would be available if the hypothetical person needed to use their arms to relieve pressure on the spine while seated. (R. at 38). The vocation expert replied that because those jobs require the use of one's arms, those jobs would no longer be available. (R. at 38).

## IV. STANDARD OF REVIEW

Judicial review of the Commissioner's final decisions on disability claims is provided by statute. 42 U.S.C. §§ 405(g)[3] and 1383(c)(3)[4]. Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based, and the court will review the record as a whole. *See* 5 U.S.C. § 706. When reviewing a decision, the

---

[3] Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[4] Section 1383(c)(3) provides in pertinent part:
> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

district court's role is limited to determining whether substantial evidence exists in the record to support an ALJ's findings of fact. *Burns v. Barnhart,* 312 F.3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995)(quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the ALJ's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F.Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947). In short, the court can only test the adequacy of an ALJ's decision based upon the rationale explicitly provided by the ALJ; the court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d. Cir. 1986).

To be eligible for social security benefits under the Act, a claimant must demonstrate that he cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F.2d 581, 583 (3d Cir. 1986). The ALJ must utilize a five-step sequential

16

analysis when evaluating whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, Appx. 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §404.1520(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

## V. DISCUSSION

In his decision, the ALJ found that Plaintiff suffered severe medically determinable impairments in the form of back disorder and obesity. (R. at 67). Plaintiff, however, was determined not to meet a listing under 20 C.F.R., Pt. 404, Subpt. P, Appx. 1. (R. at 67). Further, Plaintiff was considered to have the functional capacity to engage in substantial gainful activity on a full-time basis, but limited to sedentary work wherein Plaintiff would not be required to sit more than four hours of an eight hour workday, or stand and walk more than four hours, with the ability to alternate positions every thirty to forty five minutes, and only occasionally performing postural movements, but never climbing ladders, ropes, or scaffolds. (R. at 68). Based upon the

testimony of the vocational expert at Plaintiff's administrative hearing, a significant number of jobs in the national economy would be available to a person with the functional capacity attributed to Plaintiff. (R. at 72). Plaintiff was not, therefore, eligible for DIB. (R. at 72 – 73).

Plaintiff objects to the ALJ's determination, claiming that the ALJ erred in failing to find Plaintiff was automatically disabled according to Listing 1.04 (disorders of the spine). (ECF No. 6 at 5 – 11). It is claimed that the objective medical evidence illustrated Plaintiff qualified for DIB under Listing 1.04 (A), which states:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)

20 C.F.R., Pt. 404, Subpt. P, Appx. 1, 1.04; (ECF No. 6 at 7). Plaintiff indicates that record evidence established the existence of spinal stenosis, disc herniation, nerve root compression, atrophy/ radiculopathy, positive straight leg raising, altered gait, and diminished reflexes. (ECF No. 6 at 7 – 9). As a result, Plaintiff allegedly presented evidence sufficient to establish disability according to the listing's requirements. (ECF No. 6 at 6 – 10).

However, a review of the record does not support Plaintiff's contention. As indicated by the ALJ in his decision, there is no evidence of nerve root compromise or significant stenosis. (R. at 67, 69). A CT scan in October of 2004 showed the thecal sac and nerve root sheaths of Plaintiff's spine to be normal. (R. at 234 – 35). Dr. Wang found no evidence of nerve root impingement in March of 2005. (R. at 276). While MRIs in 2006 and 2008 were interpreted as showing mild neural encroachment and canal stenosis, Dr. Wecht – having reviewed the 2008

18

MRI – concluded that there was no significant stenosis, and no evidence of nerve root irritation. (R. at 238 – 39, 292). Having both reviewed the same 2008 MRI, neither Dr. Gerszten nor Dr. El-Kadi mentioned nerve compromise or stenosis as one of Plaintiff's ailments. (R. at 295, 298). Dr. Werries only found evidence of mild foraminal stenosis in 2007. (R. at 286 – 87). Further, as found by Plaintiff's physical therapist, there was no neuro-anatomic distribution of pain. (R. at 222 – 23).

The ALJ's determination with respect to Listing 1.04 (A) was further supported by his discussion of Plaintiff's ability to ambulate effectively. (R. at 67). Plaintiff – by his own admission – did not require the use of an assistive device to walk. (R. at 14, 67). Plaintiff's gait fluctuated between normal and mildly antalgic. (R. at 67, 69, 270, 286). Plaintiff was capable of heel and toe walking, was capable of ascending stairs to reach his second floor apartment, and was capable of walking several blocks at a time. (R. at 67 - 68, 286, 294). Though with some difficulty, Plaintiff was also capable of shopping independently. (R. at 68).

Plaintiff did have on-and-off positive straight leg raising, but in one of Dr. Wang's more recent examinations in March of 2009, it was noted that Plaintiff's straight leg raising was negative. (R. at 272). Further, Plaintiff's sensory and motor strength examinations typically indicated that Plaintiff was intact. (R. at 272, 294, 298). While Plaintiff clearly suffered certain conditions of the spine, his symptoms as alleged were simply not sufficient to entitle him to DIB. While Plaintiff argues that he meets the requirements under Listing 1.04 (A), the ALJ's explanation concisely explains why this is not the case – Plaintiff simply does not meet all the requirements under this listing.

## VI. CONCLUSION

Based upon the foregoing, the Court finds that the ALJ put forth sufficient evidence from the record to justify his decision not to find Plaintiff eligible for DIB under Listing 1.04 (A) at Step 3 in the disability analysis. As Plaintiff puts forth no other argument to dispute the ALJ's determination, the Court finds that substantial evidence supported the ALJ's finding that Plaintiff was not disabled under the Act.

Accordingly, Plaintiff's Motion for Summary Judgment will be denied, Defendant's Motion for Summary Judgment will be granted, and the decision of the ALJ will be affirmed.

*/s Arthur J. Schwab*
Arthur J. Schwab
United States District Judge

cc: All Registered ECF Counsel and Parties